911 A.2d 624 (2006)
CHRIST THE KING MANOR; Davis Manor Nursing Home; Ellen Memorial Health Care Center; Edison Manor; Good Shepherd Home-Bethlehem; Good Shepherd Home LTC Facility, Inc.; Health & Living Centers, Inc., d/b/a; Collins Health Center; Margaret E. Moul Home; Menno Haven, Inc.; Menno Haven Penn Hall; Park Pleasant, Inc.; Sycamore Creek Nursing Center; Westwood Nursing and Rehabilitation Center; Brighten at Ambler; Brighten at Broomall, Brighten at Bryn Mawr; Brighten at Julia Ribaudo; Golden Hill Nursing *625 Home, Inc.; Mary J. Drexel Home; Mon Valley Care Center, Rheems Nursing & Rehabilitation Center; Southwestern Nursing Center; Susquehanna Valley Nursing & Rehabilitation Center; Trinity Mission of Shenandoah Heights, L.P., Petitioners
v.
COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, Respondent.
Commonwealth Court of Pennsylvania.
Argued September 13, 2006.
Decided November 22, 2006.
*628 Robert B. Hoffman, Harrisburg, for petitioners.
Daniel J. Doyle, Sr., Deputy Attorney General, Harrisburg, for respondent.
BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH-RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.
OPINION BY Judge SIMPSON.
In an effort to increase funding, Petitioners[1] filed an amended petition for review. It challenges the validity of amendments to regulations for nursing facility payment rates under Pennsylvania's medical assistance program. Specifically, Petitioners seek a declaration that the amended regulations[2] are unenforceable because they were authorized by the Act of July 7, *629 2005, P.L. 177 (hereinafter "Act 42"), which is allegedly unconstitutional on several grounds. Before the Court are the Department of Public Welfare's (DPW) preliminary objections.

I. Background

A. Legislation and Amended Regulations
The Legislature enacted two pieces of legislation in 2005 affecting payment rates for medical assistance (MA) nursing facility services during State Fiscal Year (FY) 2005-06. See 35 Pa.B. at 6233 (2005) (DPW explanation for amending nursing facility payment rates). First, in the 2005 General Appropriations Act (2005 GAA),[3] the Legislature did not appropriate sufficient funds for DPW to cover the anticipated rate of inflation under the formula in its pre-amendment rate-setting regulations. Id.
Second, and as a result of the appropriations decision, Act 42 permitted DPW to amend its rate-setting methodology for nursing facilities participating in the MA program to better control inflation increases. See 35 Pa.B. at 6232-34. Further, Act 42 authorized DPW to expeditiously adopt the amendments to its rate-setting regulations in final form by using final-omitted (notice-omitted) rulemaking. See id. at 6232; 36 Pa.B. at 3207 (2006).[4]
Pursuant to Act 42, DPW amended the regulations at 55 Pa.Code § 1187.96(e)(i-ii) by adding a cost adjustment factor of .95122 for the 2005-06 rate year. Application of the cost adjustment regulations resulted in a statewide cap on nursing facility MA payment rate increases of 2.8% over the prior fiscal year rate.[5] 35 Pa.B. at 6233. DPW intended the new regulations to benefit consumers by moderating increases in nursing facility rates for FY 2005-06 "while still providing payment rate increases sufficient to assure that consumers will continue to have access to medically necessary nursing facility services." Id. at 6234.

B. Amended Petition for Review
Petitioners' amended petition for review seeks to increase funding by invalidating the cost adjustment regulations. To do so, Petitioners raise two fundamental constitutional challenges to the authorizing statute, Act 42. First, they challenge the procedure by which Act 42 was enacted. Second, they challenge Act 42 as an improper delegation of legislative authority to an administrative agency. Petitioners also assert Act 42 unlawfully exempts DPW *630 from normal regulatory oversight in promulgating the challenged regulations, but, as discussed later, this assertion is dependent upon success of the constitutional challenges.
Therefore, Petitioners request a declaration that the cost adjustment regulations are invalid, and they seek a permanent injunction requiring DPW to set rates for FY 2005-06 using the pre-amendment regulations. For the following reasons, we sustain DPW's preliminary objections and dismiss Petitioners' amended petition.[6]

1.
Since July 1996, DPW compensated both public and private nursing facilities through its MA program under what is known as the case-mix payment system. See 55 Pa.Code §§ 1187.1-1187.91-97. Am. Pet. at ¶5. Under the case-mix system, DPW inputs audited costs incurred by facilities, information on the acuity level of residents, and other factors, to arrive at individualized facility per diem rates. Id. at ¶ 6. The per diem rates are updated annually on a fiscal year basis, effective July 1 of one year through June 30 of the next year, with quarterly adjustment for patient acuity only. Id. at ¶ 7.
DPW designed the case-mix payment system with the intention of providing reasonable and adequate payments to economically and efficiently operated nursing facilities and of ensuring access to nursing facility services for its MA recipients.[7]See 25 Pa. B. at 4478 (1995). Am. Pet. at ¶ 8.

2.
In March 2005, sponsors introduced House Bill (HB) 1168, which was referred to the House of Representatives' Health and Human Services Committee. Am. Pet. at ¶¶ 9-10. HB 1168 was initially 23 lines long. Id. at ¶ 11. It proposed to amend Section 1074 of the Public Welfare Code[8] to add nursing facilities to the list of facilities DPW was authorized to inspect on an annual basis. Id. at ¶ 12. When reported out of committee in May 2005, HB 1168 was 38 lines long; the proposed amendment to Section 1074 was deleted, and a similar inspection provision was placed in a new provision, Section 1402(e) of the Welfare Code, 62 P.S. § 1402(e). Id. at ¶¶ 15-16. On June 14, the House passed HB 1168 by vote of 193-1. Id. at ¶ 18.
HB 1168 proceeded to the Senate's Public Health and Welfare Committee. Id. at ¶ 20. On June 30, it was reported out of committee; it was 22 lines long. Id. at ¶¶ 21-22. The stated purpose of the bill remained unchanged from the prior House version. Id. at ¶ 24. On July 5, the Senate unanimously passed HB 1168. Id. at ¶ 25.
On July 6, the following actions occurred: the House unanimously non-concurred *631 in the Senate amendments; the Senate insisted on its amendments; the House insisted on its non-concurrence to the Senate amendments; the House and Senate appointed representatives to a Conference Committee; the Conference Committee met at 3:55 p.m. and thereafter issued a Report; and, both houses adopted the Report and signed HB 1168. Id. at ¶ 26. DPW actively participated in these events. Id. at ¶ 27.

3.
As passed, Act 42 contained approximately 1,000 lines over 34 pages of text. Id. at ¶ 28. It included the inspection provision, which occupied 12 lines of text. Id. at ¶ 29. More significantly, Act 42 added or amended 24 other provisions of the Welfare Code. Id. at ¶ 31. Its stated purpose was changed to reflect these various additions and amendments. Id. at ¶ 30.

4.
Act 42 added or amended three specific provisions addressing nursing facility compensation. First, new Section 454 of the Welfare Code, 62 P.S. § 454, allowed DPW to promulgate regulations to establish provider payment rates and exempted DPW from the normal ratemaking process. As amended, that provision, states in pertinent part (with footnotes and emphasis added):
(a) Notwithstanding any other provision of law to the contrary, the department shall promulgate regulations as provided in subsection (b) to establish provider payment rates. . . . 

(b) For purposes of implementing this section, and notwithstanding any other provision of law, including section 814-A of this act, the secretary shall promulgate regulations pursuant to section 204(1)(iv) of the [Commonwealth Documents Law (CDL)],[9]which shall until December 31, 2005, be exempt from all of the following acts:

(1) Section 205 of the CDL,[10]
(2) Section 204(b) of the [Commonwealth Attorneys Act],[11]
(3) The [Regulatory Review Act].[12]
Act 42 also amended two provisions of Section 443.1 of the Welfare Code, 62 P.S. 443.1,[13] which governs MA payments for institutional care. Most relevant to this case, Act 42 amended Section 443.1(3) of the Welfare Code, 62 P.S. § 443.1(3). Amended Section 443.1(3) provides:

The following medical assistance payments shall be made in behalf of eligible persons whose institutional care is prescribed by physicians:
. . . .

*632 (3) Rates on a cost-related basis established by the department for skilled nursing home or intermediate care in a non-public nursing home, when furnished by a nursing home licensed or approved by the department and qualified to participate under Title XIX of the Social Security Act and provided prior to June 30, 2004;

62 P.S. § 443.1(3) (emphasis added).[14] Petitioners allege the emphasized language effectively deleted the requirement that payments be cost-related for services provided after June 30, 2004. Am. Pet. at ¶ 36. The claimed removal of this requirement is significant to Petitioner's claim that delegation of authority is improper because it lacks adequate standards for exercise of delegated administrative functions.

5.
In November 2005, DPW published its cost adjustment amendments to regulations. These effectively reduced payment rates to 95.122% of the rates that would otherwise be set under the regulations. Am. Pet. at ¶ 40. Act 42 expressly authorized the amendments and exempted them from normal regulatory oversight. Id. at ¶¶ 41, 45. The challenged regulations provided:
(i) Generally. If a nursing facility is not a new nursing facility or a nursing facility experiencing a change in ownership during the 2005-2006 rate year, that nursing facility's resident care rate, other resident related care rate, administrative rate, and capital rate will be computed in accordance with subsections (a)-(d) and the nursing facility's per diem rate will be the sum of those rates multiplied by an adjustment factor of .95122.

(ii) New nursing facilities. If a nursing facility is a new nursing facility for purposes of § 1187.97(1) (relating to rates for new nursing facilities, nursing facilities with a change of ownership, reorganized nursing facilities, and former prospective payment nursing facilities) that nursing facility's resident care rate, other resident related rate, administrative rate and capital rate will be computed in accordance with § 1187.97(1), and the nursing facility's per diem rate will be the sum of those rates multiplied by an adjustment factor of .95122.

55 Pa.Code § 1187.96(e)(i) and (ii) (emphasis added).

6.
In Counts I-IV, Petitioners allege the Legislature enacted Act 42 in a manner that violates the following procedural safeguards in the Pennsylvania Constitution: the "single-subject" requirement, PA CONST. art. III, § 3; the "changed purpose" rule, PA CONST. art. III, § 1; the "consideration of bills" requirement, PA CONST. art. III, § 4; and the text of repealed sections requirement, PA *633 CONST. art. III, § 6. Am. Pet. at ¶¶ 71-94.
In Count V, Petitioners allege Act 42 violates the non-delegation doctrine embodied in Article II, Section 2 of the Pennsylvania Constitution. Specifically, Petitioners assert, by enacting Sections 454 and 443.1(5)(i-ii) of the Welfare Code, the Legislature established no policy choices or adequate standards to guide DPW in promulgating regulations and to restrain DPW in amending its MA payment rate regulations. Am. Pet. at ¶¶ 97-98.
Petitioners' amended petition also includes three statutory causes of action. In Counts VI-VIII, Petitioners allege the challenged amendments to 55 Pa.Code § 1187.96(e)(i-ii) were promulgated in violation of the CDL, the Commonwealth Attorneys Act and the Regulatory Review Act. Am. Pet. at ¶¶ 101, 103, 105.

II. DPW's Preliminary Objections

A. Demurrers
DPW filed preliminary objections in the nature of demurrers to all eight counts. A demurrer tests the legal sufficiency of the complaint. Harding v. Stickman, 823 A.2d 1110 (Pa.Cmwlth.2003). As to Counts I-V, DPW asserts the facts pled by Petitioners do not support their claims that the enactment of Act 42 violates the protections in Article III or the non-delegation doctrine in Article II of the Pennsylvania Constitution. As to Counts VI-VIII, DPW asserts Petitioners' claims fail because the 2005 amendments to 55 Pa. Code § 1187.96(e)(i-ii) were specifically exempted from normal notice and oversight requirements in the CDL, Commonwealth Attorneys Act and Regulatory Review Act.

B. Standard of Review
In ruling on preliminary objections, the courts must accept as true all well-pled allegations of material fact as well as all inferences reasonably deducible from the facts. Dep't of Gen. Servs. v. Bd. of Claims, 881 A.2d 14 (Pa.Cmwlth.2005). However, unwarranted inferences, conclusions of law, argumentative allegations or expressions of opinion need not be accepted. Myers v. Ridge, 712 A.2d 791 (Pa. Cmwlth.1998). For preliminary objections to be sustained, it must appear with certainty that the law will permit no recovery, and any doubt must be resolved in favor of the non-moving party. Id.

III. Article III Challenges
DPW first contends the Legislature enacted Act 42 in conformity with Article III of the Pennsylvania Constitution. In support, it cites Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth, 583 Pa. 275, 877 A.2d 383 (2005) (hereinafter "PAGE"). In PAGE, the Supreme Court addressed similar Article III challenges to the enactment of the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. §§ 1101-1904.
More recently, in Stilp v. Commonwealth, 588 Pa. 539, 905 A.2d 918 (2006), the Supreme Court reviewed alleged Article III flaws in the enactment of a pay raise amendment. The amendment was enacted at about the same time as Act 42 here. In Stilp, the Court cited PAGE as controlling on Article III issues.
As an initial matter, we recognize there is a strong presumption in the law that legislative enactments do not violate our Constitution. PAGE. This includes the manner by which legislation is enacted. Id. Accordingly, a statute will not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution. Id. All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster. *634 Id. Thus, there is a very heavy burden of persuasion upon one who challenges the constitutionality of a statute. Id. In accord with these principles, we review the legal sufficiency of Petitioners' Article III claims.

A. Section 3
Article III, Section 3 of the Pennsylvania Constitution, titled "Form of Bills," provides:
No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.
This provision sets forth dual mandates for the Legislature; it prohibits the passing of a bill that contains more than one subject and requires that the subject be clearly expressed in its title. Stilp. In broad terms, Article III endeavors to place restraints on the legislative process and to encourage an open and accountable government. PAGE. Section 3 curbs the practice of incorporating a variety of distinct and independent subjects into one bill. Id. "[R]easonable notice is the keystone of Article III, Section 3." Id. at 287, 877 A.2d at 395.

1. Single Subject
In defining Section 3's single-subject requirement as it applies to amendments during the legislative process, the Court stated in PAGE, 583 Pa. at 296, 877 A.2d at 395 (citations omitted):
While recognizing the importance of Section 3, we acknowledge that bills are frequently subject to amendments as they proceed through the legislative process and not every supplementation of new material is violative of the Constitution. Thus, "where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise `germane' to the bill's subject as reflected in its title," the requirements of Article III, Section 3 are met.
Article III, Section 3 must have, however, some limits on germaneness, for otherwise virtually all legislation  no matter how diverse in substance  would meet the single-subject requirement, rendering the strictures of Section 3 nugatory. Id. Thus, defining the constitutionally-valid topic too broadly would render the safeguards of Section 3 inert. Id. Conversely, the requirements of Section 3 must not become a license for the judiciary to "exercise a pedantic tyranny" over the efforts of the Legislature. Id.
In view of these concerns, the proper focus is whether there is a "single unifying subject" to which all of the provisions of the bill are germane. Stilp; PAGE. In Stilp, the Court concluded the pay raise amendment maintained a single unifying subject: compensation for government officials. Similarly, in PAGE the Court concluded the Gaming Act maintained a single unifying subject: regulation of gaming. The Gaming Act created the Gaming Control Board, established policies and procedures for licenses for slot machines, enacted provisions to assist the state horse racing industry through other gaming, and provided for the administration and enforcement of the gaming law.
Conversely, the Supreme Court in City of Philadelphia v. Commonwealth, 575 Pa. 542, 838 A.2d 566 (2003), held Act 230 of 2002, which contained numerous amendments to Title 53 of the Pennsylvania Consolidated Statutes (Municipal Corporations), violated the single subject requirement. Act 230, among other things, altered the size and composition of the Pennsylvania Convention Center's governing board, effected a transfer of authority over taxis and limousines in Philadelphia *635 from the Public Utility Commission to the Philadelphia Parking Authority, expanded the bonding requirements for small contractors engaged in redevelopment activities in Philadelphia, and prohibited police officers from participating in election campaigns. In City of Philadelphia, the Court, noting the array of different substantive legislation, concluded the subject of "municipalities" stretched the "single unifying subject" requirement beyond the breaking point. Id.
Here, in Count I, Petitioners aver the Conference Committee amendments to HB 1168 did not help carry out the bill's main objective and were not germane to the bill's subject as reflected in its prior title. Am. Pet. at ¶ 73. Petitioners further aver the process of amending the purpose provisions of HB 1168 did not provide fair notice to the legislators and the public of the existence of the new amendments. Id. at ¶ 74, 838 A.2d 566.
DPW counters that the single unifying subject in Act 42 is regulation of the Commonwealth's publicly funded health and human services (HHS) programs and, in particular, the MA program. These HHS programs, DPW asserts, essentially involve three elements: eligibility conditions, identification of covered services and payment conditions.
We agree. The July 6 Conference Committee amendments maintain a single unifying subject, the regulation of publicly funded healthcare services. All of the provisions of Act 42 are germane to that single, unifying subject. As a result, we discern no violation of Article III, Section 3's single subject requirement.

2. Clear expression of title
Although Article III, Section 3 mandates that a bill's subject be set forth in its title, it does not require a title to be an index or a synopsis of the bill's contents. PAGE. A party seeking to declare a title unconstitutional under Article III, Section 3's "clear expression of title" requirement must show "either (1) that the legislators and the public were actually deceived as to the act's content at the time of passage, or (2) that the title on its face is such that no reasonable person would have been on notice as to the act's contents." Id. at 313, 877 A.2d at 406 (emphasis added, citation omitted).
HB 1168's original title stated:
AMENDING THE ACT OF JUNE 13, 1976 (P.L. 31, NO. 21), ENTITLED "AN ACT TO CONSOLIDATE, EDITORIALLY REVISE, AND CODIFY THE PUBLIC WELFARE LAWS OF THE COMMONWEALTH," FURTHER PROVIDING FOR VISITATION AND INSPECTION.
HB 1168, Printer's Number (PN) 1374; Am. Pet., Ex. B. HB 1168's title, at time of passage, stated:
AMENDING THE ACT OF JUNE 13, 1976 (P.L. 31, NO. 21), ENTITLED "AN ACT TO CONSOLIDATE, EDITORIALLY REVISE, AND CODIFY THE PUBLIC WELFARE LAWS OF THE COMMONWEALTH," PROVIDING FOR USE OF MEDICAL EXPENSES TO ESTABLISH MEDICAL ASSISTANCE ELIGIBILITY FOR LIFETIME LIMIT ON UNPAID MEDICAL EXPENSES . . . FOR VERIFICATION OF ELIGIBILITY AND FOR ELIGIBILITY REDETERMINATION OF PERSONS FOR MEDICAL ASSISTANCE; FURTHER PROVIDING FOR MEDICAL ASSISTANCE PAYMENTS FOR INSTITUTIONAL CARE, FOR OTHER MEDICAL ASSISTANCE PAYMENTS, FOR REIMBURSEMENT FOR CERTAIN ITEMS AND SERVICES AND FOR RELATIVES' RESPONSIBILITY; *636 PROVIDING FOR MEDICAL ASSISTANCE BENEFIT PACKAGES, FOR COVERAGE, COPAYMENTS, PREMIUMS AND RATES. . . .
HB 1168, Conference Committee Report, PN 2560: Am. Pet., Ex. E.
Petitioners fail to aver that legislators or the public were actually deceived as to HB 1168's contents at the time of passage. Therefore, they fail to plead the first theory of clear title violation.
As to the second theory of a clear title violation, we examine the title at the time of passage, set forth above. We conclude the final title of HB 1168 sufficiently puts reasonable persons on notice as to the contents of Act 42. See Stilp; PAGE.
For the above reasons, we discern no violation of Article III, Section 3's clear expression of title requirement. Id. Petitioners thus fail to state an Article III, Section 3 claim, and we sustain the preliminary objection to the Count.

B. Section 1: Changed Purpose Rule
Article III, Section 1 of the Pennsylvania Constitution, titled "Passage of Laws," provides:
No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.
A court entertaining a challenge to legislation under Article III, Section 1 must conduct a two-part inquiry. PAGE. First, the court will consider the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose. Id. Second, a court will consider, whether in its final form, the title and contents of the bill are deceptive. Id.

1. Change in Purpose
As to the first inquiry, the Court recognized in PAGE that the legislative process often results in significant changes to legislation in the hope of consensus and that transformation during the enactment process is expected. Id. The Court noted it was disinclined to substitute its judgment for that of the Legislature under the pretense of determining whether there was an unconstitutional change in purpose during the course of the bill's enactment. Id.
Rather, it is helpful for a reviewing court to assume a reasonably broad original purpose. Id. "[T]he General Assembly is given full opportunity to amend and even expand a bill, and not run afoul of the constitutional prohibition on an alteration or amendment that changes its original purpose." Id. at 318, 877 A.2d at 409. Applying this principle, the original purpose is compared to the final purpose to determine if it was changed. Id.
Here, Petitioners allege the Conference Committee completely transformed HB 1168 into a dramatically different bill. Am. Pet. at ¶ 78. This, Petitioners aver, violates the change of purpose rule in Article III, Section 1. Id. at ¶79.
DPW responds that the original purpose of HB 1168, properly construed in reasonably broad terms, was the regulation of Pennsylvania's publicly funded HHS programs, including the MA program. Although the bill initially pertained to the inspection of nursing facilities, the Conference Committee amended HB 1168 to include other provisions relating to nursing facility care, including MA payments to nursing facilities.
DPW compares Act 42's enactment to that of the Gaming Act in PAGE, which was determined to comply with Article III, Section 1. The Gaming Act originated as a *637 bill providing the Pennsylvania State Police with the power and duty to perform criminal background checks and fingerprinting in Pennsylvania's horse racing industry. The final bill, more than 140 times as long as the original, authorizes and regulates slot machine gambling in the Commonwealth. In rejecting a change of purpose challenge, the Supreme Court in PAGE stated:
Considering the original purpose in reasonably broad terms, we believe that here, and in this instance akin to our finding above regarding a single unifying subject, the original purpose of the bill was to regulate gaming. As finally passed, we find that the primary objective of the legislation was to regulate gaming. Based on the above, we conclude that the bill was not altered or amended to change its original purpose.
583 Pa. at 319, 877 A.2d at 409 (citation omitted).
In view of PAGE, we agree with DPW on this issue. Construing HB 1168's original purpose in a reasonably broad manner, the Conference Committee amendments did not change the central purpose of HB 1168: the regulation of Pennsylvania's publicly funded healthcare programs. Both the original and final versions of HB 1168 share the central purpose of ensuring proper care for Pennsylvanians who need medical assistance. Petitioners' conclusory averments to the contrary are not binding. Therefore, we conclude Petitioners failed to state a claim under this theory.

2. Bill Deceptive
We next consider whether the title and content of the bill, in its final form, were deceptive. The title of HB 1168, as set forth before, clearly reflected the amended contents of the bill.
Further, as discussed above, Petitioners fail to allege that legislators were actually deceived as to HB 1168's contents at the time of passage. See PAGE (although the substantive amendments to the Gaming Act came at the end of the consideration cycle, the contents of the bill were not deceptive); see also Stilp (although substantively amended at the end of the legislative process, Act 44, in final form, was not deceptive).
Consistent with these determinations, we conclude HB 1168 was not so altered or amended as to violate Article III, Section 1's change of purpose prohibition. As a result, the demurrer is sustained.

C. Section 4: Consideration of Bills
Article III, Section 4 of the Pennsylvania Constitution, titled "Consideration of Bills," provides in pertinent part: "Every bill shall be considered on three different days in each House." This provision requires that a bill receive three readings each in the House and Senate prior to passage; however, an amended bill need not be considered on three separate days if the amendments do not change the bill's purpose or subject matter. Stilp; PAGE. Therefore, a violation of Article III, Section 4 is dependent upon a violation of Article III, Sections 1 or 3. Id.
Here, Petitioners aver that the Conference Committee amendments were not germane to and wholly changed HB 1168. Am. Pet. at ¶¶ 83-84. Having determined Act 42 did not violate Article III, Sections 1 or 3, we conclude Petitioners fail to state a cognizable Article III, Section 4 claim. Stilp; PAGE.

D. Section 6: Text of Repealed Sections
Article III, Section 6 of the Pennsylvania Constitution, titled "Revival and amendment of laws," provides:
No law shall be revived, amended, or the provisions thereof extended or conferred, *638 by reference to its title only, but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length.
The purpose of this provision, along with the other safeguards in Article III, is to provide full notice of all legislative enactments and prevent the passage of sneak legislation. PAGE; L.J.W. Realty Corp. v. City of Phila., 390 Pa. 197, 134 A.2d 878 (1957). The constitution does not make the obviously impractical requirement that every act shall recite all other acts that its operation may incidentally affect, either by way of repeal, modification, extension or supply. Id.
Here, Petitioners claim Act 42 has the effect of amending, repealing or otherwise suspending Section 814-A(b) of the Welfare Code (pertaining to compliance with CDL and Regulatory Review Act)[15] during the period of July 2004 through June 2006. Am. Pet. at ¶ 93. Thus, Petitioners claim, Article III, Section 6 requires Act 42 to republish the entire text of Section 814-A(b). Failure to do so renders parts of Act 42 and its consequent regulations invalid.
In PAGE, the Supreme Court held Article III, Section 6 requires,
[w]ith regard to a directed, specific repealer, the effectuation of which is not otherwise apparent from the associated bill, that as much of the law that is expressly repealed by the bill must be published at length. In this way, legislators may see the elimination of particular existing legislative provisions, from the face of a pending bill, without having to refer to the existing piece of legislation for comparison.
583 Pa. at 323, 877 A.2d at 412 (emphasis added). The Court noted that Section 1903(a)(1) of the Gaming Act, 4 Pa.C.S. § 1903(a)(1), specifically repealed Section 493(29) of the Liquor Code.[16] However, Section 493(29) was not entirely republished in the Gaming Act. Accordingly, the Court held this specific repeal was invalid under Article III, Section 6.
In contrast, the Court in PAGE determined Section 1903(a)(2) of the Gaming Act, 4 Pa.C.S. § 1903(a)(2), generally repealed the provisions of 18 Pa.C.S. § 5513(a) (prohibiting gambling devices, including slot machines), insofar as inconsistent with the Gaming Act. The Court held that reference to Section 1903(a)(2) without republishing the entire text did not violate Article III, Section 6.
Here, DPW contends Act 42's temporary exemption from compliance with Section 814-A(b) of the Welfare Code does not constitute a specific repeal or amendment of Section 814-A(b). We agree, for several reasons.
First, Act 42 did not specifically repeal, amend, extend or confer any part of Section *639 814-A(b). Instead, Act 42 results in a holiday from the rigors of Section 814-A(b). The holiday is in the nature of a temporary inconsistency rather than the directed, specific repeal or amendment which is the subject of the constitutional provision. Notably, the holiday is specifically authorized by Section 201(2) of the Welfare Code, 62 P.S. § 201(2), discussed later, and by Section 204 of the CDL, 45 P.S. § 1204(1)(iv). The holiday expired June 30, 2006.
Second, Petitioners fail to aver that any legislator was misled by Act 42's failure to include the entire text of Section 814-A(b). This is not surprising, since the grant of streamlined rulemaking authority and its impact on Section 814-A of the Welfare Code is apparent from the face of Act 42.
Given the presumption of constitutionality and the reasons described above, we conclude Petitioners fail to state an Article III, Section 6 claim. Accordingly, the demurrer to this claim is sustained.

IV. Article II, Section 1 Challenge
In Count V, Petitioners allege the enactment of Act 42 violated Article II, Section 1 of the Pennsylvania Constitution, which provides, "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."
Pursuant to the non-delegation doctrine reflected in Article II, Section 1 and Article III, Section 1 (no law shall be passed except by bill), the Legislature may not delegate its lawmaking power to any other branch of government, body or authority. Ins. Fed. of Pa., Inc. v. Dep't of Ins., 585 Pa. 630, 889 A.2d 550 (2005). The Legislature, however, may delegate policy making authority to an administrative agency as long as the Legislature makes the basic policy choices and enacts adequate standards guiding and restraining the exercise of the delegated administrative functions. Id.
In determining whether the Legislature established adequate standards, we are not bound by the letter of the Act. Wm. Penn Parking Garage, Inc. v. City of Pittsburgh, 464 Pa. 168, 346 A.2d 269 (1975). Rather, we must examine the underlying purpose of the statute and its reasonable effect. Id.
In Tosto v. Pennsylvania Nursing Home Loan Agency, 460 Pa. 1, 331 A.2d 198 (1975), the Supreme Court addressed an unlawful delegation challenge to the Nursing Home Loan Agency Law.[17] The Court rejected the unlawful delegation challenge. In doing so, the Court reviewed the entire law and ascertained its basic policy: financially assisting nursing homes that failed to meet state and federal safety regulations. The Court also determined the statute included adequate standards and guidelines to guard against administrative caprice.
Here, Petitioners aver new sections of the Welfare Code establish no policy choices or standards to guide and restrain DPW in promulgating new payment rate regulations. Am. Pet. at ¶ 98. Petitioners also aver Act 42 deletes the cost-related standard for setting payment rates and replaces it with a completely "budget-driven" standard in which costs are irrelevant.[18] Because of the allegedly faulty *640 delegation of authority in Act 42, Petitioners seek a declaration that the resulting 2005 cost adjustment regulations are invalid and unenforceable.

A. Payment Standards
In support of its demurrer to the improper delegation claim, DPW asserts Act 42 did not change any existing standards related to payment rates. DPW contends the existing standards are embodied in the Welfare Code and the federal Medicaid Act, 42 U.S.C. §§ 1396-1396(v).[19] The sole purpose of Act 42 was to temporarily authorize "final-omitted" (notice-omitted) rulemaking.
DPW explains that the MA program, established in 1965, is a cooperative federal-state program. 25 Pa.B. at 4477. The Medicaid Act requires each participating state to designate one agency to administer the state MA plan (State Plan). 42 U.S.C. § 1396a(a)(5). DPW, the designated agency, must prepare a State Plan consistent with federal law and regulations. 25 Pa.B. at 4477. See also Dep't of Pub. Welfare v. Devereux Hosp. Texas Treatment Network (K.C.), 579 Pa. 313, 855 A.2d 842 (2004) (Pennsylvania's MA program, designed to provide medical assistance to individuals who cannot afford to pay for necessary medical services, was created under the Welfare Code subject to the requirements of the federal Medicaid Act.)

1. Welfare Code
We first examine the Welfare Code. DPW cites Section 201(2) of the Welfare Code as one of several existing, unaltered standards which guide and restrain it. Section 201(2) charges DPW with the following duties, which primarily relate to development of a State Plan and to promulgation of regulations to assure eligibility for federal funds:
With the approval of the Governor, to develop and submit [s]tate plans or other proposals to the [f]ederal government, to promulgate regulations, establish and enforce standards and to take such other measures as may be necessary to render the Commonwealth eligible for available [f]ederal funds or other assistance. Notwithstanding anything to the contrary in the [CDL], the department may omit notice of proposed rulemaking and promulgate regulations as final when a delay of thirty days or less in the final adoption of regulations will result in the loss of [f]ederal funds or when a delay of thirty days or less in adoption would require the replacement of [f]ederal funds with [s]tate funds.
62 P.S. § 201(2) (emphasis added). "Although participation by the [s]tates in a[f]ederal program to provide medical assistance for the `medically needy' is optional, if the [s]tate is to remain eligible for [f]ederal funding it must comply with [f]ederal [s]tatutes and regulations." Caddy v. Dep't of Pub. Welfare, 14 Pa.Cmwlth. 317, 322 A.2d 140, 142 (1974). As indicated by its language, Section 201(2) of the Welfare Code directs DPW to develop a State Plan and authorizes modified rulemaking in order to obtain federal MA funding.
*641 DPW also cites Section 206(2) of the Welfare Code, 62 P.S. § 206(2), as an existing legislative standard unaltered by Act 42. This provision requires regulations governing purchase of services to be consistent with "minimum standards of plant, equipment, service, administration and care and treatment for agencies and institutions" furnishing services under public welfare programs. Id. Further, DPW references Section 403 of the Welfare Code, 62 P.S. § 403, which provides that DPW is responsible for maintaining uniformity in the administration of public welfare programs.

2. Federal Medicaid Act
We next examine the Medicaid Act. As additional examples of existing legislative standards unaltered by Act 42, DPW cites two provisions in 42 U.S.C. § 1396a(a) relating to a State Plan's requirements: 42 U.S.C. § 1396a(a)(13)(A) (public process for determination of rates of payment under the plan for nursing facility services); and, 42 U.S.C. § 1396a(a)(30)(A) (adequacy of payment rates). Of particular significance here, Section 1396a(a)(30)(A) requires a State Plan to:
provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area. . . .
42 U.S.C. § 1396a(a)(30)(A) (emphasis added).
In Devereux Hosp., the Supreme Court, in reviewing DPW's role in Pennsylvania's MA program, noted:
The federal Medicaid Act (the "Act") provides for federal-state collaboration in the provision of medical assistance. Specifically, the Act provides that states may elect to participate in the federal Medicaid assistance program, as Pennsylvania has done, by preparing and submitting for federal approval a state Medicaid plan that complies with the Act and the regulations provided by the federal Department of Health and Human Services. See 42 U.S.C. § 1396a; 42 C.F.R. §§ 430-456. If the state plan is approved, the state will qualify for federal funding, which will cover part of the costs of the state's medical assistance program. . . . Although "states are given considerable latitude in formulating the terms of their own medical assistance plans," their "discretion is limited by the requirement that they must fully comply with the federal statutes and regulations governing the program." Addis v. Whitburn, 153 F.3d 836, 840 (7th Cir. 1998). Among other things, the Act requires that state plans "safeguard against unnecessary utilization of . . . care and services" and "assure payments are consistent with efficiency, economy and quality of care. . . ." 42 U.S.C. § 1396a(a)(30)(A).
579 Pa. at 321, 855 A.2d at 846, n. 7 (emphasis added). Thus, our Supreme Court recognizes standards of the federal Medicaid Act as restraining discretion in state plans in general, and in Pennsylvania's State Plan in particular.

3. Discussion
In sum, DPW argues that the state Welfare Code and federal Medicaid Act set the legislative standards for setting MA nursing facility payment rates both before and after Act 42. As discussed below, we *642 agree; consequently, we reject Petitioners' improper delegation challenge.
The Welfare Code directs DPW to timely submit a State Plan meeting the requirements of the federal Medicaid Act in order to obtain federal MA funds. As indicated above, one of the basic policies of the Medicaid Act is to ensure continued access to nursing facilities for individuals needing medical assistance by providing reasonable and adequate payments to economically and efficiently operated nursing facilities. MA payments must be consistent with efficiency, economy and quality of care. 42 U.S.C. § 1396a(a)(30)(a).
Inflationary costs and explosive growth of nursing facility expenditures have consistently plagued Pennsylvania's MA program.[20]See 25 Pa.B. at 4477; 35 Pa.B. at 6233. As a result, pursuant to Act 42, DPW adopted the cost adjustment amendments to its payment rate computation for FY 2005-06. This resulted in a 2.8% cap on inflation. Act 42 and its consequent amended regulations are subject to and consistent with the federal Medicaid Act's goals of efficiency and economy.
Nevertheless, Petitioners contend Act 42's amendment to Section 443.1(3) of the Welfare Code jettisoned any substantive guidance in the Welfare Code for setting MA nursing facility payment rates. Petitioners allege Act 42's amendment to Section 443.1(3) deleted the requirement that payments be provided on a cost-related basis for services provided after June 30, 2004. Am. Pet. at ¶ 36.
DPW rejoins that Section 443.1(3) still requires MA provider payment rates be set on a cost-related basis, subject to different adjustments.
We find no merit in Petitioners' argument. Primarily, we conclude the legislative standards in the state Welfare Code and, more importantly, the federal Medicaid Act quoted above are adequate to guide and restrain DPW's discretion in establishing payment methodology. Those standards are unaltered by Act 42.
While there is ambiguity in the amended language of Section 443.1(3), the ambiguity is irrelevant to our decision. Whether or not payment rates after June 30, 2004 must be cost-related, the rates must nevertheless comply with the federal Medicaid Act and the approved State Plan. This is sufficient restraint on DPW's rate-setting. Certainly, the ambiguity is insufficient to overcome the strong presumption of constitutionality.
Therefore, we hold Act 42 does not violate the non-delegation doctrine. Tosto. As a result, Petitioners' fail to state a cognizable Article II, Section 1 claim, and we sustain the demurrer to the claim.

B. 2005 GAA
Finally, DPW contends the most significant factor precipitating the cost adjustment amendments was the amount of *643 funding available. DPW points out the critical decision to allocate less than the resources needed to provide MA payments at 100% of allowable costs was made by the Legislature, not DPW. Act 42 merely authorized DPW to expeditiously amend its payment methodology to adjust to the current financial environment.
Petitioners counter that because a general appropriations bill cannot establish substantive guidance, the 2005 GAA cannot constitute a legislative standard for purposes of the non-delegation doctrine.[21] They cite Article III, Section 11 of the Pennsylvania Constitution, titled "Appropriations bills," which provides:
The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.
Also, Petitioners cite Hospital and Healthsystem Association of Pennsylvania v. Department of Public Welfare, 585 Pa. 106, 888 A.2d 601 (2005) (hereinafter "HAP"). In HAP, the Supreme Court determined a challenged MA payment rate provision in the 2002 GAA violated Article III, Section 11 by attempting to substantively amend an existing healthcare statute regulating the activities of managed care plans in the Commonwealth.
DPW argues that in HAP the Supreme Court applied a three-pronged test for determining whether language in a general appropriations bill violates Article III, Section 11. "The first prong of the test requires that the questioned provision be germane to the appropriation." HAP, 585 Pa. at 121, 888 A.2d at 610. "The second prong requires that the provision not conflict with existing legislation." Id. "The final prong . . . requires that the particular measure at issue not extend beyond the life of the appropriations bill itself." Id.
Having already concluded that the unaltered provisions of the state Welfare Code and the federal Medicaid Act sufficiently guide DPW so as to overcome an improper delegation challenge, we need not discuss this issue fully. It is sufficient for current purposes to observe that there is no language in the 2005 GAA which meets any part of the three-pronged test. Simply, the 2005 GAA neither created nor modified any substantive provision of the Welfare Code. As a result, Article III, Section 11 is inapplicable in this case. Further, the uncontested failure of the Legislature to fully fund the prior payment scheme is the ultimate policy choice guiding DPW's exercise of discretion in establishing payment methodology.

C. Commonwealth Documents Law, Commonwealth Attorneys Act and Regulatory Review Act
As discussed above, Act 42 exempted DPW from complying with requirements in the CDL, Commonwealth Attorneys Act and Regulatory Review Act. In Counts VI-VIII of their amended petition, Petitioners allege this noncompliance renders the amended regulations invalid and unenforceable.
However, the parties here agree that Counts VI-VIII rise or fall on our disposition of Counts I-V. Having determined Counts I-V fail to state a claim upon which *644 relief may be granted, we also grant DPW's demurrer to Counts VI-VIII.

V. Conclusion
In view of the foregoing, we sustain DPW's demurrers to all eight counts of Petitioners' amended petition for review. Therefore, it is dismissed. Further, we dismiss Petitioners' motion for class certification as moot.
Judge SMITH-RIBNER dissents.

ORDER
AND NOW, this 22nd day of November, 2006, DPW's Preliminary Objections are SUSTAINED and Petitioners' Amended Petition for Review is DISMISSED. Petitioners' Motion for Class Certification is hereby DISMISSED as MOOT.
NOTES
[1] Petitioners are 24 nursing facilities participating in Pennsylvania's medical assistance (MA or Medicaid) program. Substantial percentages of their residents are funded through the MA program.
[2] 55 Pa.Code § 1187.96(e)(i-ii).
[3] General Appropriations Bill of 2005, Act No. 2005-1A.
[4] Throughout the 2005 amendment process, DPW met with representatives of the four major nursing home associations on nine separate occasions "to confer with solicit and obtain input and recommendations on how [DPW] might best contain the steady inflation of nursing facility payment rates." 35 Pa.B at 6234. DPW listed comments from various nursing facilities regarding the proposed rate cap and its responses to those comments. Id. at 6234-38, 888 A.2d 601. As indicated by their participation, the nursing home associations were fully aware of the amendment process regardless of the notice-omitted rulemaking.
[5] We note that in June 2006, DPW again amended 55 Pa.Code § 1187.96(e)(i-ii) by replacing the cost adjustment factor for FY 2005-06 with an annual budget adjustment factor for FY 2006-07 and 2007-08. See 36 Pa.B. at 3208 (2006). DPW stated modification of the current MA nursing facility payment methodology is needed so it can "better achieve its original intended objective of serving the needs of the Commonwealth's MA nursing facility residents while providing for reasonable and adequate payments to MA nursing facility providers and, at the same time, establishing a mechanism that permits the controlled expansion of public expenditures." Id. at 3207(emphasis added).
[6] Also pending is Petitioners' motion for class certification. Petitioners seek to represent more than 500 similarly situated nursing facilities across the Commonwealth and claim the amount to be recovered is approximately $160 million. Because we sustain the preliminary objections and dismiss the amended petition, the motion for class certification is dismissed as moot.
[7] The case-mix system replaced the previous retrospective "cost-based" system which became highly inflationary. The case-mix system was designed to curtail the "explosive growth of nursing facility expenditures." 25 Pa.B. at 4477. "The rates generated by the case-mix payment system are payment rates; they do not reimburse nursing facilities for their past or current costs." 35 Pa.B. at 6236.
[8] Act of June 13, 1967, P.L. 32, added by Act of December 5, 1980, P.L. 1112, as amended, 62 P.S. §1074.
[9] Act of July 31, 1968, P.L. 769, as amended, 45 P.S. § 1204(1)(iv). Section 204(1)(iv) of the CDL, 45 P.S. § 1204(1)(iv) authorizes modified rulemaking in matters involving a change in an administrative regulation relating to Commonwealth property, loans, grants, benefits or contracts. MA provider payments are considered Commonwealth grants or benefits. See 35 Pa.B. at 6232.
[10] 45 P.S. § 1205 (all administrative regulations shall be approved as to legality by the Department of Justice before they are deposited with the Legislative Reference Bureau).
[11] Act of October 15, 1980, P.L. 950, as amended, 71 P.S. § 732-204 (Attorney General must review all proposed rules and regulations for form and legality before they are deposited with Legislative Reference Bureau).
[12] Act of June 25, 1982, P.L. 633, as amended, 71 P.S. §§ 745.1-745.15. The Regulatory Review Act provides a procedure for oversight and review of agency regulations adopted under the large number of statutes enacted by the Legislature. 71 P.S. § 745.2.
[13] Added by the Act of July 31, 1968, P.L. 904.
[14] In addition, new Section 443.1(5) provides that payments are to be made in accordance with preexisting regulations except as may be necessary under the DPW's approved State Plan or under new regulations, as follows:

On or after July 1, 2004, and until such time as regulations are adopted pursuant to subclause (iii), payments to county and non-public nursing facilities certified to participate as providers under Title XIX of the Social Security Act for nursing facility services shall be calculated and made as specified in the department's regulations in effect on July 1, 2003, except as may be otherwise required by:
(i) the Commonwealth's approved Title XIX Plan for nursing facility services;
(ii) regulations promulgated by section 454;
. . .
. . . .
62 P.S. § 443.1(5) (emphasis added).
[15] Added by the Act of September 30, 2003, P.L. 169, 62 P.S. § 814-A(b). Section 814-A(b) provides (with emphasis added):

During each fiscal year in which an assessment is implemented pursuant to this article, [DPW] shall not adopt new regulations that limit, restrict or reduce eligibility for medical assistance nursing facility services or program participation or reimbursement for medical assistance nursing facility providers without publishing a notice of proposed rulemaking and adopting a final-form regulation after public notice and comment in accordance with 45 Pa.C.S. (relating to legal notices) and the [CDL] and subject to review pursuant to the "Regulatory Review Act." Notice of proposed rulemaking shall not be omitted pursuant to section 204 of the [CDL] and no final-form regulation subject to this section may take effect pursuant to emergency certification by the Governor under section 6(d) of the "Regulatory Review Act."
[16] Act of April 12, 1951, P.L. 90, as amended, 47 P.S. § 4-493(29).
[17] Act of July 22, 1974, P.L. 610, as amended, 62 P.S. §§ 1521.101-1521.411, repealed in most part by the Act of February 23, 1996, P.L. 27.
[18] In promulgating its 2006 amendments to its nursing facility payment regulations, DPW states one of the purposes of its new regulations is to replace the case-mix methodology for county-owned nursing facilities with a new rate-setting methodology, effective July 2006. 36 Pa.B. at 3207-08. However, Petitioners' non-public nursing facilities will remain in the case-mix payment system, which DPW modified by adding the budget adjustment factor for the 2006-07 and 2007-08 rate years. Id. at 3208-09.
[19] In its notice of the amendments to the case-mix payment rates in 55 Pa.Code § 1187.96(e)(i-ii), DPW cites as authority Sections 201(2), 206(2), 403(b), 443.1(5) and 454 of the Welfare Code, 62 P.S. §§ 201(2), 206(2), 403(b), 443.1(5) and 454. See 35 Pa. B. 6232 (2005).
[20] As noted above, nursing facilities were initially reimbursed under a retrospective cost-based system. 25 Pa.B. at 4477. In the 1990s, the case-mix system replaced the cost-based system. Id. DPW intended the case-mix payment system to curtail runaway inflation and the uncontrolled growth of expenditures under the cost-based system. Id. However, "[b]etween 2000 and 2005, the per diem rates produced by the case-mix payment system increased by approximately 5.8% every year and 29.4% overall." 35 Pa.B. at 6235. With no adjustment, DPW determined, "the payment system will generate per diem rates for [FY 2005-06] that will increase by approximately 7.9% over the prior fiscal year." Id. "In June of 2005, [DPW] anticipated that, given the expected financial resources at its disposal, it would be unable to continue to sustain this pace of inflation, and would have insufficient funds to pay for the estimated quantity of nursing facility services through the entire 2005-2006 rate year." Id.
[21] Petitioners cite a July 6, 2005 letter from DPW Secretary Estelle Richman to the Senate and House leadership confirming an understanding that expedited regulations were needed by December 31, 2005 to be consistent with MA program appropriations. See Petitioners' Brief, Ex. B.