Billie WASHINGTON, Tina Smith, Opal Gibson, Pennsylvania Mental Health Consumers' Association, Mental Health Association in Pennsylvania, Mental Health Association of Southeastern Pennsylvania, The Philadelphia Alliance, Drug and Alcohol Service Providers Organization of Pennsylvania, Pennsylvania Community Providers Association, Success Against All Odds, Petitioners

v.

The DEPARTMENT OF PUBLIC WELFARE of the Commonwealth of Pennsylvania, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 17, 2013.

Decided June 24, 2013.

---

Michael R. Froehlich and Gregory B. Heller, Philadelphia, Carol A. Horowitz, Pittsburgh and Allen C. Warsaw, Harrisburg, for petitioners.

Jason W. Manne, Deputy Chief Counsel, Pittsburgh, for respondent.

Donald Marritz, Gettysburg, and Robert F. Williams, Camden, NJ, for amici curiae Resources for Human Development, Inc., Women's Law Project, Pennsylvania Alliance for Retired Americans, Comhar Inc., Pennsylvania Coalition Against Domestic Violence, Pennsylvania Social Services Union, SEIU Local 668, AIDS Law Project of Pennsylvania, Common Cause of Pennsylvania, Pennsylvania Immigration and Citizenship Coalition, Education Law Center of Pennsylvania, Coalition Against Hunger, HIV Policy Collaborative of Pennsylvania, Housing Alliance of Pennsylvania, Philadelphia Coalition, and Ethical Humanist Society of Philadelphia.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, LEAVITT, Judge, BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge LEAVITT.

Billie Washington, Tina Smith, Opal Gibson, Pennsylvania Mental Health Consumers' Association, Mental Health Association in Pennsylvania, Mental Health Association of Southeastern Pennsylvania, The Philadelphia Alliance, Drug and Alcohol Service Providers Organization of Pennsylvania, Pennsylvania Community Providers Association and Success Against All Odds (collectively, Petitioners) challenge the Act of June 30, 2012, P.L. 668, No. 80 (Act 80), which amended the Public Welfare Code.[1] These amendments affected a number of human services programs administered by the Department of Public Welfare, including general assistance, medical assistance, child welfare, mental health services, intellectual disabilities services, physical disabilities services and nursing home services. Petitioners assert that Act 80 is unconstitutional on procedural and substantive grounds. They contend that Act 80 was not enacted in accordance with the procedures mandated in Article III of the Pennsylvania Constitution and, thus, is procedurally unconstitutional. They also contend that Act 80 is substantively invalid because it delegates legislative authority to the Department of Public Welfare. Petitioners seek to enjoin enforcement of Act 80.[2] Respondent, the Department of Public Welfare, seeks the dismissal of all six counts of Petitioners' action for the stated reason that not one count presents a legally cognizable claim.

## Procedural Background

Petitioners include both individuals and associations. The individual petitioners are three residents of Philadelphia, who received cash assistance under the Commonwealth's general assistance program prior to Act 80's elimination of that program in August 2012. The association petitioners advocate for the beneficiaries of the human services programs affected by Act 80 and for the institutions that provide these services and, in some cases, actually provide services.

The petition for review contains six counts that challenge Act 80, which began as House Bill 1261, Printer's Number 1385, and ended up as House Bill 1261, Printer's No. 3884 when it was enacted

---

1. The Act of June 13, 1967 (P.L. 31, No. 21), *as amended*, 62 P.S. §§ 101–1503, has as its official short title "Public Welfare Code." Section 101 of the Act of June 13, 1967, P.L. 31, 62 P.S. § 101.

2. Petitioners also sought relief in the form of a preliminary injunction. On October 25, 2012, this Court (per Quigley, S.J.), denied Petitioners' application on the basis that Petitioners had not satisfied the requisites for a preliminary injunction. Petitioners appealed Judge Quigley's order to the Supreme Court, where the appeal is pending at No. 93 MAP 2012.

into law. The six counts in the petition for review follow:

- Count I asserts a violation of Article III, § 1 of the Pennsylvania Constitution for the stated reason that the original purpose of House Bill 1261 changed during the course of its enactment.
- Count II asserts a violation of Article III, § 3 of the Pennsylvania Constitution for the stated reason that House Bill 1261 covers more than one subject.
- Count III asserts a violation of Article III, § 4 of the Pennsylvania Constitution for the stated reason that House Bill 1261 was not considered on three different days in each chamber of the General Assembly.
- Count IV asserts a violation of Article III, § 24 of the Pennsylvania Constitution for the stated reason that House Bill 1261 provides for spending on the Pilot Block Grant Program in excess of what was appropriated by the General Assembly in the General Appropriations Act for 2012–2013.
- Count V asserts a violation of Article II, § 1 of the Pennsylvania Constitution for the stated reason that House Bill 1261 delegates legislative power to the Department of Public Welfare by not providing the criteria by which the Department would choose 20 counties, out of 67, for the Pilot Block Grant Program or would grant those counties waivers from certain statutory requirements applicable to human services programs.
- Count VI asserts a violation of the act commonly known as the Commonwealth Documents Law[3] for the stated reason that the Department has not promulgated regulations that are necessary to implement the Pilot Block Grant Program.

The Department of Public Welfare filed preliminary objections in the nature of a demurrer to all six counts of the petition for review. On November 16, 2012, this Court granted intervention to the Pennsylvania Health Care Association, which filed its own demurrer to Counts I through III of the petition for review. The parties have briefed the preliminary objections, and a number of public interest organizations have filed a joint *amicus curiae* brief in favor of Petitioners.[4]

## Legislative History of Act 80

On April 1, 2011, Rep. Thomas Quigley introduced House Bill 1261, Printer's Number 1385 in the House of Representatives. The bill amended the residency requirements for several human services programs: general assistance, medical assistance, and temporary assistance for needy families. The three-page bill was considered on three separate days in the House, passed by the House, and sent to the Senate on April 12, 2011. On April 25, 2011, the Senate referred House Bill 1261 to its Public Health and Welfare Committee. Before the Senate Committee took

---

**3.** Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602; 45 Pa.C.S. §§ 501–907.

**4.** The *amici curiae* are: The Pennsylvania Immigration and Citizenship Coalition; Education Law Center of Pennsylvania; Pennsylvania Coalition Against Domestic Violence; Pennsylvania Alliance for Retired Americans; Resources for Human Development, Inc.; SEIU Local 668 (The Pennsylvania Social Services Union); Coalition Against Hunger; AIDS Law Project of Pennsylvania; HIV Policy Collaborative of Pennsylvania; COMHAR, Inc.; Housing Alliance of Pennsylvania; Women's Law Project; Philadelphia Coalition; Ethical Humanist Society of Philadelphia; and Common Cause of Pennsylvania.

action on House Bill 1261, the legislature enacted the Act of June 30, 2011, P.L. 89, No. 22 (Act 22), which was identical in substance to House Bill 1261.

On June 5, 2012, the Senate Public Health and Welfare Committee took up House Bill 1261 and amended it in two ways. First, it amended the newly enacted residency requirements set forth in Act 22.[5] Second, it added new provisions relating to adoption and guardianship subsidies for youth between the ages of 18 and 21. The Senate considered House Bill 1261, as amended, on June 5 and June 6, 2012, and referred it to the Senate Appropriations Committee.

On June 29, 2012, the Senate Appropriations Committee reported out House Bill 1261 with additional amendments. These amendments:

- Created a Human Services Pilot Block Grant Program under which 20 counties selected by the Department would receive funding for mental health, intellectual disability, substance abuse, child welfare, elder care and other human services programs in the form of block grants rather than categorical appropriations;

- Imposed new planning and reporting requirements upon counties with respect to their human services programs;

- Eliminated the General Assistance program of cash benefits;

- Established new requirements for certain Medical Assistance recipients;

- Established new work requirements for Temporary Assistance for Needy Families recipients;

- Imposed new sanctions on Temporary Assistance recipients who do not comply with work requirements; and

- Extended the Nursing Facility Assessment Program, scheduled to sunset on June 30, 2012, to prevent the loss of $455,077,000 in state revenue and matching federal funding.

These amendments were printed up in a final 12–page bill, i.e., House Bill 1261, Printer's No. 3884, and referred to the Senate for a vote.

On June 29th, the Senate passed House Bill 1261, Printer's No. 3884 and returned it to the House for concurrence. That evening, House Bill 1261 was referred to the House Rules Committee, which concurred in the Senate's changes and sent the bill to the House floor for final passage. On June 30, the House voted to approve House Bill 1261 as amended; it passed by one vote. At 11:45 p.m., Governor Tom Corbett signed House Bill 1261, which became Act 80.

### Standards for a Demurrer

■■■ In reviewing preliminary objections, the Court must accept as true all well-pled allegations in the pleading and all inferences reasonably deducible therefrom. *Pennsylvania Builders Association v. Department of Labor & Industry*, 4 A.3d 215, 220 (Pa.Cmwlth.2010). However, the Court need not accept as true unwarranted inferences, conclusions of law, arguments or opinions that appear in the pleading. *Id.* To sustain preliminary objections, it must appear with certainty that the law will not permit recovery, and any doubt should be resolved in favor of overruling the preliminary objections. *Id.*

---

**5.** The Senate made two technical changes to the residency requirements set forth in Act 22. It changed the phrase "applicant's place of residence" to "applicant's or recipient's place of residence," and it changed the word "insure" to "ensure."

██ All legislative enactments, as well as the manner in which they are enacted, enjoy a presumption that they do not violate the Pennsylvania Constitution. *Id.* Accordingly, a party that challenges the constitutionality of a statute bears a heavy burden of persuasion to overcome this presumption. *Id.* A statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Pennsylvania Constitution and *all doubts* are to be resolved in favor of finding that the legislative enactment passes constitutional muster. *Id.*

### Counts Under the Procedural Mandates of Article III of the Pennsylvania Constitution

Article III of the Pennsylvania Constitution sets forth mandatory requirements that apply to the procedures by which all legislation is to be enacted. *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 179, 507 A.2d 323, 334 (1986), *abrogated on other grounds by Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005) (*"PAGE"*). These rules are a cornerstone of our democratic process. *See generally PAGE*, 583 Pa. at 293, 877 A.2d at 394. Three sections of Article III are implicated in this litigation, and they are:

#### Passage of Bills

Section 1. No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

\* \* \*

#### Form of Bills

Section 3. No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

#### Consideration of Bills

Section 4. Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least twenty-five percent of the members elected to that House, any bill shall be read at length in that House. No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

PA. CONST. art. III, §§ 1, 3, 4.[6]

Adopted in 1864, Article III, Section 3 is the central, and earliest of, the above-listed constitutional provisions. Known as the single-subject rule, Article III, Section 3 was designed to eliminate the legislative practice known as "log-rolling." This practice allows several minorities to combine separate bills, no one of which could be passed on its own, into a single omnibus bill to obtain the requisite majority needed to enact any bill into law. The single-subject rule provides a bulwark against this practice.[7] It stands in the way of burying the true, and perhaps controversial, purpose of a bill in a gauze of unrelat-

---

**6.** Because the Pennsylvania Constitution has undergone several revisions since 1864, the numbering of the sections has changed over the years. Their content has not changed.

**7.** *See* Jefferson B. Fordham and Carroll C. Moreland, *Pennsylvania's Statutory Imbroglio: The Need of Statute Law Revision*, 108 U. PA. L.REV. 1093, 1100–03 (1960).

ed provisions. *Commonwealth v. Green,* 58 Pa. 226, 234 (1868). The Pennsylvania Supreme Court observed the efficacy of the single-subject rule a mere two years after its adoption:

> It cannot be doubted that this restriction upon the legislature was designed to prevent an evil which had long prevailed in this state as it had done elsewhere, which was the practice of blending in the same law subjects not connected with each other and often entirely different.

*Blood v. Mercelliott,* 53 Pa. 391, 394 (1866). More recently, in a formal opinion, the Attorney General explained:

> The primary and universally-recognized goal of the one-subject rule is to prevent log-rolling—the practice of several minorities combining their several, different proposals into one bill in order to obtain a majority vote for the omnibus bill.... In addition to preventing log-rolling the one-subject rule promotes an orderly legislative process; by limiting each bill to one subject, the issue presented by a bill can be better grasped and more intelligently discussed.

PA. ATTY. GEN. OP. 78–16 (August 11, 1978), 8 Pa. Bull. 2480 (September 2, 1978).

The Pennsylvania Constitution was amended in 1874 to add provisions now set forth in Article III, Sections 1 and 4. Section 1 limits the scope of the amendments that can be made to a bill as it moves through the process of legislative compromise and revision. Section 4 ensures that legislators can make informed decisions by requiring the House and Senate each to consider a particular bill on three separate days.

Sections 1, 3 and 4 work together rather effectively when one compares Pennsylvania legislation to the work product of other legislative bodies, such as the United States Congress, that are not subject to the salutary discipline imposed by Article III of our Pennsylvania Constitution. *See, e.g.,* The Omnibus Reconciliation Act of 1980, Public Law 96–499, which, *inter alia,* amended Medicare, made retroactive annuity adjustments to employees in the Civil Service and Postal Service, amended the Social Security Act, permitted tax free rollover of bonds and defined ketchup as a vegetable, at least for purposes of the federal school lunch program.[8]

### Count I: Original Purpose

■■ Whether a bill has departed from its original purpose is determined by application of a two-part test. As our Supreme Court has directed:

> First, the court will consider the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose. Second, a court will consider, whether in its final form, the title and contents of the bill are deceptive.

*PAGE,* 583 Pa. at 317, 877 A.2d at 408–09. As this Court has held, "[t]he challenged

---

**8.** To be fair, it was a regulation promulgated under the Omnibus Reconciliation Act of 1980 that authorized ketchup to be counted as a vegetable, by expanding the definition of "vegetable" to include vegetable-based condiments. National School Lunch, School Breakfast, and Child Care Food Programs; Meal Pattern Requirements, 46 Fed. Reg. 44452–01 (proposed Sept. 4, 1981). President Ronald Reagan withdrew the regulations under media scrutiny. *See* Marion Nestle, *Ketchup Is a Vegetable? Again?,* The Atlantic (Nov. 16, 2011, 11:02 AM), http://www.theatlantic.com/ health/archive/2011/11/ketchup-is-a-vegetable-again/248538/ (discussing United States Department of Agriculture regulation permitting federal school lunch program participants to count pizza sauce as a vegetable and discussing the 1981 media uproar over permitting ketchup to be counted as a vegetable).

legislation must survive both inquiries to pass constitutional muster." *Marcavage v. Rendell,* 936 A.2d 188, 192 (Pa.Cmwlth. 2007), *affirmed,* 597 Pa. 371, 951 A.2d 345 (2008). Petitioners assert that Act 80 fails to satisfy the first requirement but do not claim that there was anything deceptive about House Bill 1261's final form.

When House Bill 1261 was introduced on April 1, 2011, its original purpose was to clarify eligibility requirements for certain public assistance benefits. These requirements were enacted *verbatim* in 2011 in Act 22, which began as a bill in the Senate. According to Petitioners, Act 22 rendered House Bill 1261, which was under consideration by a Senate committee, a "hollow" bill. It follows, according to Petitioners, that the original purpose of House Bill 1261 had been rendered "moot" by Act 22. Further, the amendments made in 2012 by the Senate to House Bill 1261 went beyond the original purpose of House Bill 1261, which was simply to close a loophole in the residency requirements for certain public assistance benefits.

When introduced on April 1, 2011, the stated purpose of House Bill 1261 was:

> Amending [*the Public Welfare Code*], entitled "An act to consolidate, editorially revise, and codify the public welfare laws of the Commonwealth," in *public assistance,* further providing for definitions and for *determination of eligibility.*

House Bill 1261, Printer's No. 1385. When finally adopted, the stated purpose of House Bill 1261 was:

> An Act *amending* [*the Public Welfare Code*], in general powers and duties of the Department of Public Welfare, providing for county human services consolidated planning and reporting; *in public assistance,* further providing for definitions, providing for cessation of the general assistance cash program and the

continuation of the general assistance-related medical assistance programs, further providing for establishment of RESET, for *determination of eligibility,* for failure to comply with employment and work-related activity requirements and for medically needy and determination of eligibility; in children and youth, further providing for definitions; in nursing facility assessments, further providing for time periods; in kinship care, further providing for definitions and for Kinship Care Program, providing for Subsidized Permanent Legal Custodianship Program and for permanent legal custodianship subsidy and reimbursement; providing for Human Services Block Grant Pilot Program; and making related repeals.

House Bill 1261, Printer's No. 3884. The Department of Public Welfare contends that a broad read to the original purpose of House Bill 1261 is required by our Supreme Court, and this broad reading supports the conclusion that the various amendments made in the Senate did not change the original purpose of House Bill 1261.

*PAGE* is the leading case on Article III procedural challenges to legislation. There, the original purpose of the bill in question was the authorization of the state police to perform criminal background checks for licensees of the State Harness and Horse Racing Commission. The final bill was 140 times longer and had evolved into a bill that, *inter alia,* authorized and regulated slot machines. The Supreme Court reasoned that when the original purpose of the bill was viewed in the larger context of the final bill, the original purpose of the bill could be understood as the regulation of gaming. *PAGE,* 583 Pa. at 319, 877 A.2d at 409. Accordingly, the Supreme Court held that the final bill did not offend Article III, Section 1 of the

Pennsylvania. Constitution. *See also Christ the King Manor v. Department of Public Welfare*, 911 A.2d 624 (Pa.Cmwlth. 2006) (upholding a 12–line bill that began with the original purpose of authorizing the Department to do an annual inspection of nursing facilities and ended with amendments to 24 other provisions of the Public Welfare Code by giving a broad read of the original purpose, *i.e.*, regulation of healthcare programs).

 Amendments are central to the legislative process and their need expressly acknowledged in Article III, Section 4 of the Pennsylvania Constitution. A bill's original purpose must be considered in "reasonably broad terms" because legislation evolves as it moves through both chambers of the General Assembly. *PAGE*, 583 Pa. at 318, 877 A.2d at 409. When discerning a bill's purpose, courts should "hypothesize, based upon the text of the statute, as to a reasonably broad original purpose." *Id.* Further, courts should be "loathe to substitute [their] judgment for that of the legislative branch under the pretense of determining whether an unconstitutional change in purpose of a piece of legislation has occurred during the course of its enactment." *Id.*

Mindful of the Supreme Court's directive that a broad read should be given to a bill's original purpose and that the court should hypothesize a reasonably broad purpose from the text of the statute, we hold that Act 80 does not offend Article III, Section 1 of the Pennsylvania Constitution and sustain the demurrer to Count I. House Bill 1261's original purpose can be understood from the text of Act 80 to be the regulation and funding of human services programs regulated by the Department of Public Welfare.

### Count II: Single–Subject Rule

 In Count II, Petitioners assert that Act 80 violates Article III, Section 3

because, when finally enacted, House Bill 1261 contained seven subjects that ranged from eligibility for public assistance programs, *i.e.*, the "original purpose," to an array of social service programs, such as mental health services, child welfare services, adoption subsidies and the regulation of nursing facilities. These topics cannot, Petitioners argue, be united under "a single subject." The Department rejoins that they can be so united.

Our Supreme Court explained in *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566 (2003), that courts must give deference to the General Assembly in testing legislation against the strictures of Article III, Section 3. This requires courts to look for, and, if necessary, *hypothesize* a reasonably broad theme when determining the subject of a bill:

> We believe that exercising deference by hypothesizing reasonably broad topics in [the] manner [of more recent Commonwealth Court Article III cases] is appropriate to some degree, because it helps ensure that *Article III does not become a license for the judiciary to "exercise a pedantic tyranny" over the efforts of the Legislature.*

*Id.* at 578, 838 A.2d at 588 (emphasis added) (citations omitted).

In *PAGE*, the Supreme Court rejected a single-subject challenge to a statute with seven chapters and over 80 sections. The various provisions included: the creation of a new state agency, the Gaming Control Board; the authorization of slot machines and their regulation; the imposition of enforcement powers and duties upon the Pennsylvania State Police; the establishment of new crimes and penalties; the revision of the Pennsylvania Supreme Court's jurisdiction with respect to gaming matters; and the codification of the new gaming law. The Supreme Court held

that these diverse topics were all germane to a unifying subject: the regulation of gaming. *See PAGE*, 583 Pa. at 297, 877 A.2d at 396.

In *Christ the King Manor*, 911 A.2d at 624, this Court rejected a single-subject challenge to Act 42 of 2005,[9] which began as an amendment to one provision of the Public Welfare Code but ended as a bill amending 24 provisions of the Code. The petitioners claimed that the amendments to the bill "were not germane to the bill's subject as reflected in its prior title" and that the amendments did not provide fair notice to the legislators or the public. *Id.* at 635. The Department countered that the "single unifying subject in Act 42 is regulation of the Commonwealth's publicly funded health and human services (HHS) programs...." *Id.* This Court agreed, holding that the bill "maintain[ed] a single unifying subject, the regulation of publicly funded healthcare services" and that "[a]ll of the provisions of Act 42 are germane to that single, unifying subject." *Id.*

By contrast, in *City of Philadelphia*, 575 Pa. 542, 838 A.2d 566, the Supreme Court concluded that the subject "municipalities" was far too broad in scope to provide a single unifying theme for diverse topics including, *inter alia*, the imposition of limits on the political activities of police officers; the imposition of a citizenship requirement for board members of business improvement districts; the transfer of regulatory authority from the Public Utility Commission to the Philadelphia Parking Authority; and the authorization of municipalities to hold gifts in trust. *Id.* at 552–53, 838 A.2d at 572–73. Indeed, it was impossible for "municipalities" to serve as the single unifying theme because, *inter alia*, the statute's amendments to the

Pennsylvania Convention Center Authority Act concerned an instrumentality of the Commonwealth, not a municipality. *Id.* at 580, 838 A.2d at 589–90.

Recently, in *Pennsylvania State Association of Jury Commissioners v. Commonwealth*, —— Pa. ——, 64 A.3d 611 (2013), our Supreme Court held that Act 108 of 2011 [10] violated the single-subject rule because it (1) abolished the office of county jury commissioner and (2) authorized county commissioners to sell certain county property. The Supreme Court held that the theme "powers of county commissioners" was too broad in scope to unify such disparate topics in a single bill. *Id.* at ——, 64 A.3d at 619. It was as ineffective a unifying theme as "municipalities" was in *City of Philadelphia*, 575 Pa. 542, 838 A.2d 566.

The Department of Public Welfare's proffered unifying theme for Act 80 is "public assistance programs, including health and human services." Intervenors' proffered theme is "regulation of the Commonwealth's public assistance programs administered by the Department under the Public Welfare Code." Intervenor Brief at 12. Both parties note that the various sections of Act 80, which deal with general assistance, medical assistance, child welfare, mental health, intellectual disabilities and long-term nursing facilities, cover topics no more diverse in scope than the original enactment of the Public Welfare Code. Each topic in Act 80 is germane to the other.

Petitioners respond that the topics covered by Act 80 stretch the limits of Article III, Section 3 to the breaking point. They argue that Act 80 is more akin to those statutes that have been found to offend the single-subject rule. For example, Act

---

9. Act of July 7, 2005, P.L. 177, No. 42.

10. Act of December 15, 2011, P.L. 442, No. 108.

2002–57,[11] which amended the Judicial Code by (1) changing tort liability standards and (2) codifying the DNA Act, was held to have violated Article III, Section 3 even though the bill amended a single statute, The Judicial Code. *DeWeese v. Weaver*, 880 A.2d 54 (Pa.Cmwlth.2005). In *Sears v. Corbett*, 49 A.3d 463 (Pa.Cmwlth. 2012), this Court struck down legislation that redirected funding from the tobacco settlement account and effected legislative changes to building permits, heritage areas and crime victim compensation. Petitioners argue that "public assistance" is a term of art that refers to specific, means-tested programs. Further, the adoption and guardianship subsidies in Act 80 provide inducements to care for older youth in the child welfare system and have nothing to do with means-tested "public assistance" programs. Not all of Act 80 amends the Public Welfare Code; some provisions amend the Mental Health Code. Petitioners contend that the theme proffered by the Department and Intervenor is no more focused than "programs administered by the Department of Public Welfare," which is not very much of a unifying theme considering that this agency accounts for over 30 percent of the Commonwealth's annual budget.

Petitioners offer a pointed log-rolling argument about the provision in Act 80 that extended the sunset date for the nursing facility assistance program. This program was due to sunset the day before the new fiscal year was to begin, which would have resulted in a loss of substantial federal funds. Legislators in the House were faced with an impossible decision: vote "yes" on the amendments to House Bill 1261 or vote "no" and cause the loss of $477 million in federal funds for fiscal year 2012–2013. By including the extension of the nursing facility assistance program to-

gether with other, perhaps more controversial, amendments to the Public Welfare Code, such as the abolition of the General Assistance program, the statute was assured passage, which it did by a single vote in the House. This, Petitioners argue, offers a classic example of log-rolling.

■ To satisfy the single subject rule, a bill may amend several statutes so long as the amendments pertain to the same subject. *See, e.g., PAGE*, 583 Pa. at 296, 877 A.2d at 395. On the other hand, having all amendments apply to a single codified statute does not, in itself, satisfy the single subject rule. *See, e.g., DeWeese*, 880 A.2d at 58 n. 10. Act 80 did not confine its statutory changes to the Public Welfare Code. What matters, however, is whether a single unifying theme can be found. Our job is not to micro-manage the legislature but to give effect, if possible, to the presumption of constitutionality enjoyed by Act 80.

■ Applying those principles here, we conclude that Act 80 does not violate Article III, Section 3 of the Pennsylvania Constitution. As the Department of Public Welfare points out, the various health and human services programs covered by Act 80 are of a piece. They work together like parts of a single machine. A change to one human services program affects the others. In this way, all the elements of Act 80 can be unified under the theme of improving the effectiveness and efficiency of the delivery of human services programs to people in need. The individual provisions are logically related to one another. As we have elsewhere explained, "subject" should not be confused with "content." *Spahn v. Zoning Board of Adjustment*, 922 A.2d 24, 30–31 (Pa.Cmwlth. 2007). Likewise, a single subject may en-

**11.** Act of June 19, 2002, P.L. 394, No. 57.

compass many subtopics. *PAGE*, 583 Pa. at 312–13, 877 A.2d at 406. Act 80 is not an omnibus bill that "clearly and palpably" offends Article III, Section 3 of the Pennsylvania Constitution. We sustain the demurrer to Count II.

### Count III: Three Bill Readings.

The Pennsylvania Constitution requires, in pertinent part, that "every bill shall be considered on three different days in each House." PA. CONST. art. III, § 4. Petitioners acknowledge that the House of Representatives considered House Bill 1261, Printer's No. 1385 on three separate days in 2011: April 5, 11 and 12, 2011. Likewise, the Senate considered House Bill 1261 on three days in 2012: June 5, 6 and 29, 2012. However, in its final amended version, House Bill 1261, Printer's No. 3884 was read in the Senate only one time: June 29, 2012.

Amendments do not require three readings. The only explicit requirement in Article III, Section 4 is that all amendments "shall be printed for the use of the members before the final vote is taken. . . ." PA. CONST. art. I II, § 4. That requirement was satisfied here.

█ Where it is acknowledged that a bill has undergone three readings in each chamber of the General Assembly, Article III, Section 4 is facially satisfied. Only where amendments change a bill's original purpose or violate the single-subject rule will the failure to give three readings of the amendments cause a violation of Article III, Section 4. Stated otherwise, a violation of Article III, Section 1 or 3 must first be established before three readings of an amendment will be required to satisfy Article III, Section 4. *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918 (2006).

Because we hold that Act 80's enactment process did not violate Article III, Section 1 or Section 3, it necessarily follows that

Act 80 did not violate Article III, Section 4. We sustain the demurrer to Count III.

### Counts Challenging The Pilot Block Grant Program

Section 12 of Act 80, entitled "Human Services Block Grant Pilot Program," adds Article XIV–B to the Public Welfare Code. Petitioners challenge Article XIV–B on two grounds. First, they claim that it violates Article III, Section 24 of the Pennsylvania Constitution, which does not allow money to leave the treasury "except on appropriations made by law." Petitioners assert that Article XIV–B allows the executive branch to deviate from the appropriations made in the General Appropriations Act for 2012–2013, thereby giving the executive branch the ability to move funds from the state treasury without authorization from the legislature. Second, they claim that Article XIV–B impermissibly delegates legislative power to the Department of Public Welfare, which has been given a free hand (1) to decide which 20 counties, out of 67, will be chosen to participate in the pilot block grant program and (2) to grant participating counties waivers from certain statutory strictures that apply to the block grant program.

### Standing

█ As a threshold issue, the Department of Public Welfare challenges the standing of Petitioners to challenge any aspect of the pilot block grant program in Article XIV–B of the Public Welfare Code because none of them are county governments, and they do not purport to represent the interests of any county. The Petitioners respond that their organizational members, the Mental Health Association in Pennsylvania, the Mental Health Consumers' Association, the Mental Health Association of Southeastern Pennsylvania, the Philadelphia Alliance, the

Drug and Alcohol Service Providers Organization of Pennsylvania, and the Pennsylvania Community Providers Association, have alleged facts to show that they, or the clients they serve, will be harmed by the pilot block grant program.

 A party has standing if it is aggrieved, *i.e.*, if it has "a substantial, direct, and immediate interest in" the litigation. *Pennsylvania Medical Society v. Department of Public Welfare*, 614 Pa. 574, 591, 39 A.3d 267, 278 (2012); *City of Philadelphia*, 575 Pa. at 560, 838 A.2d at 577. A party's interest is "substantial" if it "exceeds that of all citizens in procuring obedience to the law." *City of Philadelphia*, 575 Pa. at 560, 838 A.2d at 577. An interest is "direct if there is a causal connection between the asserted violation and the harm complained of[.]" *Id.* An interest is "immediate if that causal connection is not remote or speculative." *Id.* In the event that the immediacy of the party's interest is not apparent, the Court should assess whether the party is within the "zone of interest" sought to be protected by the statute or constitutional protections raised. *Johnson v. American Standard*, 607 Pa. 492, 516–17, 8 A.3d 318, 333 (2010).

The Mental Health Association provides services to individuals with mental illness in southeastern Pennsylvania, including Bucks, Chester and Delaware Counties, which counties have been selected to participate in the pilot block grant program. Petition for Review ¶ 19. The Mental Health Association's interest exceeds the interests of all Pennsylvania's citizens because it provides mental health services in the selected counties. The association's interest is immediate and direct because Article XIV–B of the Public Welfare Code jeopardizes its funding by allowing counties to divert funds appropriated for mental health services to other programs.

The other organizations serve individuals with mental illness, intellectual disabilities, and substance abuse issues and the agencies that provide treatment and services to these individuals. Petition for Review ¶¶ 17–18, 20–21, 23. These organizations have an interest in the pilot block grant program, which seeks to reorganize the delivery of human services in the selected counties along a new model. The interest of the members is superior to that of the general population and is direct. The interest is immediate because the Department already has implemented the pilot block grant program and selected participating counties. *Cf. Pennsylvania Medical Society*, 614 Pa. at 593, 39 A.3d at 279 (holding that association of health care providers had interest in litigation based on possible increased future assessments so as to confer standing to challenge Department of Public Welfare's administration of abatement law); *Parents United for Better Schools, Inc. v. School District of Philadelphia*, 166 Pa.Cmwlth. 462, 646 A.2d 689, 692–93 (1994) (organization of public school parents had interest in public school policy sufficient to confer standing).

Petitioners assert that the pilot block grant program threatens the organizational petitioners and their members with direct harm caused by the loss of funding for services that they receive or provide. These members and providers have interests that exceed those of the general public in ensuring that Act 80 complies with the constitutional prohibition against diversion of appropriated funds. Their interest is both immediate and direct.

Counties disappointed that they were not chosen to participate in the pilot block grant program may also have standing, but that is irrelevant to Petitioners' standing. The complaint pleads that the organizational Petitioners and their members will be harmed by Article XIV–B because, in-

evitably, it will adversely affect their funding from the Department via the counties. We agree with Petitioners and hold that these allegations by the organizational petitioners are sufficient to establish their standing to lodge a constitutional challenge to Sections 1402–B, 1404–B, 1405–B and 1406–B of the Public Welfare Code.

## Count IV: Article III, Section 24 of the Pennsylvania Constitution

The Pennsylvania Constitution provides that "[n]o money shall be paid out of the treasury, *except on appropriations made by law.*" PA. CONST. art. III, § 24 (emphasis added). As the Pennsylvania Supreme Court explained in *Jubelirer v. Rendell,* 598 Pa. 16, 953 A.2d 514 (2008), "[t]he executive branch may not of its own initiative use funds appropriated for one program in carrying out another and may not spend on a program more than its designated amount." 598 Pa. at 42, 953 A.2d at 530 (quoting *Shapp v. Sloan,* 480 Pa. 449, 469, 391 A.2d 595, 604 (1978)). In *Adams County v. Department of Public Welfare,* 502 Pa. 47, 58, 463 A.2d 1002, 1007 (1983), the Supreme Court stated that the Department was "prohibited from reimbursing counties [for certain child welfare programs] in an amount in excess of the amount appropriated by the Legisla-

ture for that purpose." Simply stated, Article III, Section 24 gave the legislature the exclusive power to authorize the release of money from the state treasury. By contrast, "nowhere in our Constitution is the executive branch given any right or authority to appropriate public monies for any purpose." *Shapp v. Sloan,* 480 Pa. at 465, 391 A.2d at 603.

Act 80 authorizes the Department to use funds that have been appropriated for fiscal year 2012–2013 for seven separate programs and apply those funds to the pilot block grant program.[12] Further, a county selected for the program is authorized to move up to 20 percent of its state funding from one type of human services program to another. For example, a county can transfer funds intended for intellectual disability services and use them to increase substance abuse services. 62 P.S. § 1405–B(b)(1).[13] Petitioners assert that it is unconstitutional for a county to use funds appropriated for one human services program for an entirely different human services program.

The Department responds that the pilot block grant program is not unconstitutional because the General Assembly has expressly authorized this use of funds in Act 80. All Article III, Section 24 requires is *"legislative action* before money can be

---

**12.** These line items in the General Appropriations Act of 2012(GAA) are: "mental health services" in the amount of about $662.3 million; "intellectual disabilities—community base program" in the amount of $151.2 million; "Medical Assistance—Outpatient Services" in the amount of $360.1 million; "Behavioral Health Services" in the amount of $43.1 million; "children and youth programs for the care of delinquent and dependent children" in the amount of $1 billion; the human services development fund in the amount of $13.4 million; and homeless assistance services in the amount of $18.5 million. GAA, S.B. 1466, P.N. 2335 (2012), at 286, 289, 295, 297, 302. The GAA states that the appropriated "sums ... are hereby specifically ap-

propriated from the general fund for the purposes hereinafter set forth." *Id.* at 201–02.

**13.** The percentage amount increases in each successive fiscal year until fiscal year 2016–2017 when there will be no limit on the amount of funds that participating counties can divert from one program to another. *See* Section 1405–B(b) of the Public Welfare Code, 62 P.S. § 1405–B(b). Even before that time, counties can seek waivers from the Department to authorize diversion of more funds from one program to another than permitted by Section 1405–B(b). *See* Section 1405–B(c) of the Public Welfare Code, 62 P.S. § 1405–B(c).

paid out of the treasury." *Shapp v. Sloan,* 480 Pa. 449, 463, 391 A.2d 595, 602 (1978) (emphasis added). Act 80 is such legislative action and a substantive statute, such as Act 80, prevails over an appropriations act.[14]

Petitioners rejoin that Article III, Section 24 forbids spending funds "except on *appropriations* made by law...." PA. CONST. art. III, § 24 (emphasis added). They contend that an appropriations bill is the exclusive vehicle "for allocating money to government departments to enable them to conduct their operations...." *Sears v. Corbett,* 49 A.3d 463, 475 (Pa. Cmwlth.2012) (quotation omitted). An appropriations bill "stipulat[es] the amount, manner, and purpose of the various items of expenditures...." *Id.* (quotation omitted). Act 80 is not an appropriations bill: it neither "specifically allocates public monies from the General Fund to budget line items [n]or otherwise authorizes the ex-

penditure of these monies." *Id.* Petitioners contend that the only lawful way to shift funds from the appropriated purpose to another purpose is by a subsequent appropriations bill that specifically includes funding for a human services pilot block grant program; Act 80 is not an appropriations bill.

Petitioners further argue that it is inevitable that the Department, when it moves funding from one line item to another, will spend more than the amount appropriated in the General Appropriations Act for 2012–2013, which would violate the principles laid down in *Adams County,* 502 Pa. 47, 463 A.2d 1002. They acknowledge that a single county can be allocated no more than a proportional share of the appropriated program amount. *See* 62 P.S. § 1405–B(a).[15] However, if a county takes 20 percent of its proportional funding for drug and alcohol treatment and applies it to another program, such as children and

---

**14.** Neither party addresses continuing appropriations, which have been acknowledged by our Supreme Court to be a valid form of appropriation. *See, e.g., Sears v. Corbett,* 49 A.3d 463 (Pa.Cmwlth.2012).

**15.** Section 1405–B(a) of the Public Welfare Code states:

Allocation.—The department shall allocate State block grant funds to counties as follows:

(1) The department shall allocate State block grant funds according to each county's proportional share of the aggregate amount of the following State funds allocated for fiscal year 2011–2012:

(i) Funds allocated to counties under the act of October 5, 1994 (P.L. 531, No. 78), known as the Human Services Development Fund Act.

(ii) Funds allocated to counties for mental health and intellectual disability services under the act of October 20, 1966 (3rd Sp.Sess., P.L. 96, No. 6), known as the Mental Health and Intellectual Disability Act of 1966.

(iii) Funds allocated to counties for behavioral health services.

(iv) Funds allocated to counties for drug and alcohol services under section 2334 of the act of April 9, 1929 (P.L. 177, No. 175), known as The Administrative Code of 1929.

(v) Funds allocated to counties for the provision of services to the homeless.

(vi) Funds allocated to county child welfare agencies as certain additional grants under section 704.1(b).

(2) The department shall allocate Federal block grant funds to counties according to each county's fiscal year 2011–2012 proportional share of each Federal appropriation associated with the funds identified in paragraph (1).

(3) Funds identified in paragraphs (1) and (2) that were allocated to county local collaborative arrangements shall be allocated to individual counties based on the individual county population.

(4) The department may revise the allocation of Federal funds identified in paragraph (2) as necessary to comply with applicable Federal requirements.

62 P.S. § 1405–B(a).

youth, and all other spending remains the same, the amount appropriated in the General Appropriations Act of 2012–2013 will be exceeded, both at the county level and at the State level. Not spending funds appropriated for a program, such as drug and alcohol treatment, does not raise an Article III, Section 24 issue because the constitution does not mandate that all funds appropriated actually be spent. In that case, the appropriated funds simply lapse.

"Preliminary objections should be sustained only in cases that are clear and free from doubt." *Pennsylvania AFL–CIO v. Commonwealth,* 563 Pa. 108, 114, 757 A.2d 917, 920 (2000) (*AFL–CIO*). In *AFL–CIO,* the petitioners challenged the constitutionality of certain amendments to the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708, for the stated reason that the amendments had not been enacted in accordance with the procedural mandates of Article III of the Pennsylvania Constitution. This Court sustained the demurrer, but the Pennsylvania Supreme Court held that this Court erred, at least with respect to the claim brought under Article III, Section 5. The Supreme Court explained:

> Here, in sustaining Appellees' preliminary objections, the Commonwealth Court concluded that Appellants had failed to convince the court that the General Assembly, in enacting Act 57, had violated Article III, Section 5. In reaching this conclusion, however, the Commonwealth Court specifically noted that before the instant case, no Pennsylvania court had interpreted the language of Article III, Section 5 in a published opinion. In fact, the Commonwealth Court explicitly recognized that more than one interpretation of the language in Article III, Section 5 may be possible.

> Given these circumstances, we agree with Appellants that the Commonwealth Court erred in finding that Appellees had met their burden of demonstrating that the law interpreting Article III, Section 5 is clear and free from doubt, as is required to prevail on preliminary objections. Thus, we conclude that the Commonwealth Court improperly sustained Appellees' preliminary objections to Appellants' claim that the procedure used to enact Act 57 failed to comply with Article III, Section 5.

*AFL–CIO,* 563 Pa. at 114–15, 757 A.2d at 920–21 (citation omitted).

Article III, Section 24 has been construed by our appellate courts. Nevertheless, we cannot say that its application to Act 80 is clear and free from doubt. In addition, it is not clear that the challenge lodged by Petitioners can be considered without a record, particularly with regard to their claim that the expenditures under the pilot block grant program will necessarily exceed what has been appropriated for the 2012–2013 fiscal year and, thus, violate Article III, Section 24. Accordingly, we overrule the demurrer to Count IV of the petition for review.

### Count V: Delegation of Legislative Power

■ Article II, Section 1 of the Pennsylvania Constitution vests legislative power in the legislature. It states:

> The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.

PA. CONST. art. II, § 1. Legislative power is the power to make a law and, thus, the General Assembly "cannot constitutionally delegate the power to make law to any ... other body or authority." *Blackwell v. State Ethics Commission,* 523 Pa. 347, 359–60, 567 A.2d 630, 636 (1989).

■ Nevertheless, the legislature can "make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Bell Telephone Co. of Pennsylvania v. Driscoll,* 343 Pa. 109, 114, 21 A.2d 912, 914 (1941) (quoting *Locke's Appeal,* 72 Pa. 491, 498 (1873)). The legislature must make the basic policy choices, but it can "impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions" of the statute. *Chartiers Valley Joint Schools v. County Board of School Directors of Allegheny County,* 418 Pa. 520, 529, 211 A.2d 487, 492 (1965) (quoting *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 342, 54 A.2d 277, 284 (1947)). In that situation, "it is the legislature which has legislated and not the administrative body." *Bell Telephone,* 343 Pa. at 114, 21 A.2d at 915.

■ When conferring power on an agency to decide the facts and apply the law to a particular situation, the legislature must establish the standards for exercising the power. *Id.* at 115–16, 21 A.2d at 915–16. *Bell Telephone* involved a statute that required the Public Utility Commission to approve every contract between a public utility and an "affiliated interest" as a condition precedent to the contract's validity. A public utility's failure to obtain this approval could result in a fine of $5,000 and five years' imprisonment. Bell Telephone challenged the statute as unconstitutional because it did not provide any standards by which the Commission was to conduct its review and grant its approval, or disapproval, of a contract. The Commission responded, somewhat obliquely, that the statute was constitutional because it contained the "implicit" standard of "public interest."

The Supreme Court rejected this argument, concluding that even if public interest could be read into the statute, it was no standard at all. Rather, it is the legislature's responsibility to determine what constitutes the public interest. The Supreme Court reasoned as follows:

> Before any commission can decide whether a contract is contrary to public interest, it is necessary to find out what is or what is not in the public interest. The power to make such determination rests with the legislature and without such declaration the commission would be without a standard or criterion.

*Id.* at 116, 21 A.2d at 915. Accordingly the legislature

> *must surround such authority with definite standards, policies and limitations* to which such administrative officers, boards or commissions, must strictly adhere and by which they are strictly governed. If the legislature fails, however, to prescribe with reasonable clarity the limits of the power delegated or if those limits are too broad its attempt to delegate is a nullity.

*Id.* at 116, 21 A.2d at 915–16 (citing *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)) (emphasis added). Because the statute lacked "definite standards" it was declared unconstitutional.

■ Petitioners contend that the pilot block grant program in Act 80 is founded upon an unconstitutional delegation of authority in two ways. First, Article XIV–B grants the Department of Public Welfare unlimited discretion to determine which 20 counties, of 67, will be permitted to participate in the pilot block grant program. Second, Article XIV–B grants the Department unlimited discretion to waive certain statutory requirements for counties participating in the pilot block grant program. The Department responds that the legislature has provided the standards because it has limited the county participation limits;

prohibited counties from eliminating certain human services programs; and required the Department to make payments to counties on a quarterly basis.

The first relevant provision in Article XIV–B is found in Section 1402–B of the Public Welfare Code. It states:

Section 1402–B. Establishment of Human Services Block Grant Pilot Program.

The Human Services Block Grant Pilot Program is established for the purpose of allocating block grant funds to county governments to provide locally identified county-based human services that will meet the service needs of county residents. A county's request to participate in the block grant shall be on a form and contain such information *as the department may prescribe. The department, in its discretion, may approve a county's request based on criteria determined by the department.* No more than 20 counties may participate in the block grant in any fiscal year.

62 P.S. § 1402–B (emphasis added). Petitioners contend that Section 1402–B has delegated legislative authority to the Department by giving it unfettered discretion to choose counties for participation in the pilot block grant program.

The stated purpose of the pilot block grant program is to "meet the service needs of county residents." *Id.* That states a goal, not a standard. Our Supreme Court has held that "public interest" is not, in itself, a standard because it is for the legislature to define the public interest. *Bell Telephone*, 343 Pa. at 116, 21 A.2d at 915. In *MCT Transportation, Inc. v. Philadelphia Parking Authority*, 60 A.3d 899 (Pa.Cmwlth.2013), we held Section 5707(b) of the Parking Authority Law, 53 Pa.C.S. § 5707(b), to be unconstitutional because it, *inter alia*, gave unfettered discretion to the state agency in

question to establish its annual budget. The statute provided that the Philadelphia Parking Authority had to set its budget in an amount "necessary to advance the purposes of this chapter." We held this phrase to be no more instructive than "public interest." In fact, the phrase expressed a grant of power, not a limit. It is for the legislature, not the agency, to determine what budget is necessary to advance the regulation of taxicabs and limousines in Philadelphia. *MCT Transportation*, 60 A.3d at 914.

Likewise, here, it is for the legislature to decide what meets "the service needs of the county," not the Department of Public Welfare. 62 P.S. § 1402–B. As in *MCT Transportation*, the language of Section 1402–B expresses a grant of power, not a standard or a limit on agency power.

Section 1402–B of the Public Welfare Code gives the Department "discretion" to approve or disapprove a county's request to participate in the program according to "criteria determined by the [D]epartment." *Id.* The Department could choose a county, for example, on the basis of the political affiliation of the county executive or of the majority county commissioners or on any other basis. The legislature has not provided the Department any guidance on how to pick 20 of the 67 counties that might participate in the pilot block grant program.

This is not to say that legislative standards have to be detailed. The General Assembly could decide that the 20 counties could be self-selected on a first-come, first-served basis. Counties could be chosen by lottery, even when the county did not wish to participate. The counties could be chosen by a mix of urban and rural locations, declining program need, increasing program need or any combination of the above. With these basic policy choices made, the Department's role would be lim-

ited to making factual findings in accordance with legislative criteria and so devise its application "form." 62 P.S. § 1402–B. As it is, Section 1402–B of the Public Welfare Code appears to delegate legislative power to the Department of Public Welfare, in violation of separation of powers.

Petitioners challenge two other provisions in Article XIV–B on grounds that they delegate legislative authority to the Department. These provisions authorize the Department to waive certain statutory requirements for those counties chosen to participate in the pilot block grant program. The first is Section 1405–B(c), which states:

> (c) Waiver.—
>
> A county may request in writing that the department waive the requirements of subsection (b).[16] *The department may, in its discretion, grant the request upon good cause shown by the county.*

62 P.S. § 1405–B(c) (emphasis added). The second is Section 1406–B(b), which states:

> (b) Reinvestment.—

16. Subsection (b) of Section 1405–B of the Public Welfare Code requires counties to allocate their block grants in certain ways to assure a proper expenditure on mental health services, intellectual disability services, child welfare services, drug and alcohol treatment services, homeless assistance services and behavioral health services. It states:
 > Expenditure.—Each county participating in the block grant shall expend its allocated block grant funds as follows:
 > (1) For State fiscal year 2012–2013, each county shall expend on each of the following county-based human services at least 80% of the amount the county is allocated under the funds identified in subsection (a)(1) for that county-based human service:
 > (i) Community-based mental health services.
 > (ii) Intellectual disability services.
 > (iii) Child welfare services.
 > (iv) Drug and alcohol treatment and prevention services.
 > (v) Homeless assistance services.
 > (vi) Behavioral health services.
 > (2) For State fiscal year 2013–2014, each county shall expend on each of the following county-based human services at least 75% of the amount the county was allocated under the funds identified in subsection (a)(1) for that county-based human service:
 > (i) Community-based mental health services.
 > (ii) Intellectual disability services.
 > (iii) Child welfare services.
 > (iv) Drug and alcohol treatment and prevention services.

 > (v) Homeless assistance services.
 > (vi) Behavioral health services.
 > (3) For State fiscal year 2014–2015, each county shall expend on each of the following county-based human services at least 50% of the amount the county is allocated under the funds identified in subsection (a)(1) for that county-based human service:
 > (i) Community-based mental health services.
 > (iv) Intellectual disability services.
 > (iii) Child welfare services.
 > (iv) Drug and alcohol treatment and prevention services.
 > (v) Homeless assistance services.
 > (vi) Behavioral health services.
 > (4) For State fiscal year 2015–2016, each county shall expend on each of the following county-based human services at least 25% of the amount the county is allocated under the funds identified in subsection (a)(1), for that county-based human service:
 > (i) Community-based mental health services.
 > (ii) Intellectual disability services.
 > (iii) Child welfare services.
 > (iv) Drug and alcohol treatment and prevention services.
 > (v) Homeless assistance services.
 > (vi) Behavioral health services.
 > (5) For State fiscal year 2016–2017 and thereafter, counties may expend block grant funds on county-based human services as determined by local need.
 Section 1405–B(b) of the Public Welfare Code, 62 P.S. § 1405–B(b).

A county participating in the block grant may submit to the department a written plan to reinvest up to 3% of its block grant allocation for any State fiscal year to be expended on county-based human services in the next State fiscal year. *The 3% limitation may be waived by the department upon good cause shown by the county.*

62 P.S. § 1406–B(b) (emphasis added). Petitioners argue that "good cause" does not express a basic policy choice and, thus, delegates legislative power to the Department.

"Good cause" provides guidance that appears no more meaningful than "public interest." *Bell Telephone*, 343 Pa. at 115–16, 21 A.2d at 915–16. In Section 1405–B(b) of the Public Welfare Code, the legislature has established a definitive timetable and specific standards for the gradual elimination of the strictures on a county's ability to move funds from one program to another. Stated otherwise, it has made the policy choice that full implementation of the pilot block grant program should be steady and gradual. In Section 1405–B(c), however, the legislature gives the Department the discretion, on "good cause," to waive that implementation schedule in one or all years and collapse the timetable. Likewise, the legislature has limited the amount of funds that a county can reinvest in a single year, unless the Department lifts the limits on "good cause."

In sum, Section 1405–B(c) and Section 1406–B(b) appear to vest legislative authority in the Department of Public Welfare, in violation of separation of powers.

Because Petitioners have stated a claim in Count V with respect to Sections 1402–B, 1405–B(c) and 1406–B(b), we overrule the Department of Public Welfare's demurrer.

## Count VI: The Commonwealth Documents Law

As an alternative to its contention that Article XIV–B delegates legislative power to the Department of Public Welfare, Petitioners assert that the Department was required to promulgate a regulation before exercising the discretion conferred upon it in Article XIV–B. Because we have overruled the Department's demurrer to Count V, we must also overrule its demurrer to Count VI.

## Conclusion

For the reasons stated above, we sustain the demurrer to Counts I, II and III of the petition for review and overrule the demurrer to Counts IV, V and VI of the petition for review.

Judge LEADBETTER joins as to Counts I, II, III, & VI and dissents as to Counts IV and V.

## *ORDER*

AND NOW, this 24th day of June, 2013, the demurrer of Respondent and Intervenor to Counts I, II and III of the above-referenced petition for review is sustained; Counts I, II and III are dismissed. Respondent's demurrer to Counts IV, V and VI is overruled. Respondent and Intervenor are directed to file answers to Counts IV, V and VI of the petition for review within thirty (30) days of the date of this order.